IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Kimberly M.,[1]                                          No. 3:23-cv-00985-HZ

                    Plaintiff,                           OPINION & ORDER

         v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

                    Defendant.


Jeffrey Hugh Baird
Dellert Baird Law Office
2825 NE Brazee St
Portland, OR 97212

         Attorney for Plaintiff

Kevin C. Danielson
Assistant United States Attorney
District of Oregon
1000 SW Third Avenue, Suite 600
Portland, OR 97204

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case. Where applicable, this Opinion uses the same designation for a non-governmental party's immediate family member.

Katherine B. Watson
Social Security Administration
Office of the General Counsel
6401 Security Blvd
Baltimore, MD 21235

   Attorneys for Defendant

HERNÁNDEZ, District Judge:

   Plaintiff Kimberly M. brings this action seeking judicial review of the Commissioner's

final decision to deny disability insurance benefits ("DIB") and to partially deny supplemental

security income ("SSI"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g)

(incorporated by 42 U.S.C. § 1383(c)(3)). The Court reverses the Commissioner's decision and

remands this case for payment of benefits.

**PROCEDURAL BACKGROUND**

   Plaintiff applied for DIB on July 29, 2014, and SSI on April 28, 2015, alleging an onset

date of January 1, 2011. Tr. 454-456.[2] Plaintiff's date last insured ("DLI") is December 31,

2013. Tr. 2195. Her application was denied initially and on reconsideration. Tr. 212-213, 245-

246.

   On March 20, 2017, Plaintiff appeared with counsel for a hearing before an

Administrative Law Judge ("ALJ"). Tr. 250. On September 8, 2017, the ALJ found Plaintiff not

disabled. Tr. 261. The Appeals Council vacated the ALJ's decision because the ALJ was not

properly appointed. Tr. 350. Plaintiff attended another hearing before a different ALJ on April

28, 2020. Tr. 16. She attended another hearing on December 22, 2020. Tr. 16. On February 3,

2021, the ALJ found Plaintiff not disabled. Tr. 29. Plaintiff sought review from the district court.

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative
record, filed herein as Docket No. 7.

Tr. 2287-2289. On June 13, 2022, Judge Stacie Beckerman remanded the case to the ALJ pursuant to the parties' stipulation. Tr. 2294-2296. On February 16, 2023, Plaintiff attended a fourth hearing before a different ALJ. Tr. 2192. On April 24, 2023, the ALJ found that Plaintiff was not disabled prior to May 9, 2022. Tr. 2209. The ALJ found that Plaintiff was disabled beginning May 9, 2022. Tr. 2209.

## FACTUAL BACKGROUND

Plaintiff initially alleged disability based on Hashimoto's thyroiditis, Lyme disease, pernicious anemia, depression, anxiety, fatigue, short-term memory problems, poor reading comprehension, obsessive-compulsive tendencies, inflammatory bowel disease, and an autoimmune neuropsychiatric disorder. Tr. 507. At the time of her alleged onset date, she was 38 years old. *See* Tr. 454. She has at least a high school education and past relevant work experience as a general office clerk, office helper, receptionist, promotions assistant/demonstrator, and waitress. Tr. 2207.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Disability claims are evaluated according to a five-step procedure. *See Valentine v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137,

140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines

whether the claimant has a "medically severe impairment or combination of impairments."

*Yuckert*, 482 U.S. at 140–41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not

disabled. *Id.*

In step three, the Commissioner determines whether the claimant's impairments, singly

or in combination, meet or equal "one of a number of listed impairments that the [Commissioner]

acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141;

20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if

not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any

impairment(s), has the residual functional capacity (RFC) to perform their "past relevant work."

20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can perform past relevant work, the

claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to

the Commissioner. In step five, the Commissioner must establish that the claimant can perform

other work. *Yuckert*, 482 U.S. at 141–42; 20 C.F.R. §§ 404.1520(e)–(f), 416.920(e)–(f). If the

Commissioner meets their burden and proves that the claimant can perform other work that

exists in the national economy, then the claimant is not disabled. 20 C.F.R. §§ 404.1566,

416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity after her alleged onset date. Tr. 2195. Next, at steps two and three, the ALJ determined

that Plaintiff has the following severe impairments: "neuroendocrine carcinoma (diagnosed in

2019), chronic headaches, postural orthostatic tachycardia syndrome (POTS), Hashimoto's

thyroiditis, pernicious anemia, and depressive disorder." Tr. 2195. However, the ALJ determined that Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. Tr. 2195. At step four, the ALJ concluded that Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with the following limitations:

> [T]hey can occasionally climb ramps and stairs; can never climb ladders ropes or scaffolds; can occasionally balance stoop kneel crouch and crawl; can have no more than occasional exposure to extreme temperatures, vibration, and pulmonary irritants; can have no exposure to hazards; are limited to simple and detailed work that can be learned in 30 days or less, with no more than occasional changes in a routine work setting; and can have occasional interaction with coworkers and the public.

Tr. 2197. Because of these limitations, the ALJ concluded that Plaintiff could not perform her past relevant work. Tr. 2207. But at step five, the ALJ determined that prior to May 9, 2022, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, such as "Semiconductor dye loader," "Touch up screen inspector," and "Document clerk." Tr. 2208. Thus, the ALJ concluded that Plaintiff was not disabled prior to May 9, 2022. Tr. 2209. The ALJ determined that Plaintiff's age category changed beginning May 9, 2022, and that as of that date, no jobs exist in significant numbers in the national economy that Plaintiff can perform. Tr. 2208. Thus, the ALJ found that Plaintiff was disabled beginning May 9, 2022, and was eligible for SSI benefits from that date onward. Tr. 2209.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted). "Substantial evidence means more than a mere scintilla but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's.") (internal quotation marks omitted).

## DISCUSSION

Plaintiff argues that the ALJ erred by (1) rejecting her subjective symptom testimony about her fatigue, and (2) improperly evaluating several medical opinions. Pl. Op. Br., ECF 8. The Court concludes that the ALJ erred and that this case should be remanded for payment of benefits.

## I.    Subjective Symptom Testimony

The ALJ is responsible for evaluating symptom testimony. SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017). The ALJ engages in a two-step analysis for subjective symptom evaluation. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (superseded on other grounds). First, the ALJ determines whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (internal quotations omitted). Second, "if the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give specific, clear and

convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." *Id.* (internal quotations omitted).

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). "An ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). Instead, "the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001); *see also Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony.").

At her hearing in 2023, Plaintiff testified that she left her job as a waitress around December 2010 because she felt too sick to work. Tr. 2233. Her symptoms included "intense sore throats, joint pains, low-grade fever, horrible insomnia. I think I said achy joints, stiff neck." Tr. 2233. She developed dizziness. Tr. 2233. She testified that between 2011 and 2013, she went to different doctors trying to find out what was wrong. Tr. 2234. Plaintiff testified that between 2011 and 2013, she lived with her mother and spent her days resting, and her mother had to cook for her. Tr. 2234. She tried to do a photography job in 2012, but it "did not go well" because she "had a lot of fatigue" and "extreme anxiety." Tr. 2235. The job lasted less than a month. Tr. 2236. The fatigue interfered with her concentration, and she felt overwhelmed. Tr. 2235. She would have better and worse periods. Tr. 2235. She described her fatigue as "an exhaustion where it's hard to think, so it's physical." Tr. 2236. She explained that it was accompanied by "a

cluster of symptoms, which is a sore throat, achy muscles, joints, low-grade fever, sort of feeling like you're coming down with something, and it affects how I can think and how I can tolerate stress." Tr. 2236.

Plaintiff testified in 2017 that she could not work full-time because, among other reasons, "I've been having difficulty with fatigue, with energy." Tr. 156. She did not feel well-rested even if she slept ten hours. Tr. 163. She testified, "It's almost like thinking tires me out[.]" Tr. 168. She testified that she was also physically tired. Tr. 168.

In April 2020, Plaintiff testified, "fatigue is definitely still an issue." Tr. 116. She would get fatigue that felt like brain fog when she was mentally overstimulated. Tr. 116. She testified that she had good days and bad days. Tr. 131. Bad days felt like "a perpetual flu," and she would spend the day in bed. Tr. 132. Physical or mental overexertion triggered a bad day. Tr. 132. Plaintiff testified that she could have a bad day the day after she went to work and had a busy or stressful day. Tr. 133. It happened "a few times a month." Tr. 133. She testified that acupuncture helped. Tr. 133. Rest was the best way to avoid a bad day. Tr. 133.

The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported for the reasons explained in this decision." Tr. 2198. The ALJ discounted Plaintiff's testimony about her fatigue based on her activities, her course of treatment, and the objective medical record. Tr. 2198-2202.

A.    Activities of Daily Living

Contradiction with a claimant's activities of daily living is a clear and convincing reason for rejecting a claimant's testimony. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).

There are two grounds for using daily activities to support an adverse credibility determination: (1) when activities meet the threshold for transferable work skills, and (2) when activities contradict a claimant's other testimony. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). In order to impact a claimant's credibility, the activity has to be "inconsistent with claimant's claimed limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ cannot mischaracterize statements and documents in the record or take these out of context in order to reach his or her conclusion on the claimant's credibility. *Id.* at 722-23. In addition, the claimant's ability to perform limited basic daily activities is not a clear and convincing reason to reject a claimant's testimony. *See id.* at 722 ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations."); *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005) ("The mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from [her] credibility as to [her] overall disability. One does not need to be utterly incapacitated in order to be disabled.") (internal quotation omitted).

The ALJ concluded that Plaintiff "has engaged in a somewhat normal level of daily activity and interaction." Tr. 2201. The ALJ pointed to Plaintiff's part-time work, travel, and activities of daily living, concluding that these activities "are not consistent with a finding of total disability." Tr. 2201.

Plaintiff testified in 2017 that she worked three to four days per week for Amazon Prime shopping for orders and preparing them for a driver to deliver to the customer. Tr. 151. She stated that she was "exhausted after a day" of doing that job. Tr. 163. She testified she did four- to five-hour shifts and sometimes called off the last one because she did not feel well. Tr. 163. On average, this happened two days a month. Tr. 164. Since 2014, Plaintiff also salvaged

clothing and sold it in a space at a storefront. Tr. 152. She testified that she did "every facet" of the business, except that she did not go out buying clothing anymore. Tr. 152-153. She described the job as "a struggle." Tr. 164. She testified that she struggled with both jobs because she had trouble staying on task and got "more easily rattled." Tr. 165.

At her hearing in April 2020, Plaintiff testified that she stopped working for Amazon in late 2017 or early 2018, and stopped selling clothing out of a retail space in 2018. Tr. 109-110. At her hearing in 2023, Plaintiff testified that she had tried to run the vintage clothing business for about two years but "was never able to turn a profit," so she let someone else take it over. Tr. 2238. She stated that she hoped her health would improve, but it did not. Tr. 2238. She explained that she spent no more than 15 hours a week working for the business and was "never able to consistently put hours in, which I think is a big factor in not being successful." Tr. 2238. Her fatigue was the main reason she could not do more. Tr. 2238-2239. She testified that when she was not working that job, she spent her time in bed. Tr. 2239.

In May 2018, Plaintiff started a new job. Tr. 110. She usually worked 10 to 12 hours a week and on rare occasions worked up to 20 hours a week. Tr. 111. The day after she worked, she would rest. Tr. 134. She testified that she was usually late to work. Tr. 136. She testified that she had a stool she could sit on at her job and she could take breaks during her shift. Tr. 139-141. She testified that she could not have worked forty hours a week at the job for the same reasons as for her earlier jobs. Tr. 2244.

Plaintiff testified in 2017 that she had tried to travel for work with her ex-boyfriend who was a director. Tr. 159. She stated that "it was a bad situation" because she "ended up having to go to the emergency room[.]" Tr. 159. She explained that she helped him with set styling and getting people camera-ready. Tr. 159-160. She said she did not do this very often, and it did not

usually involve travel. Tr. 160. Plaintiff testified in 2017 that she traveled to Michigan to see her family once a year. Tr. 160. She stated that the trips were "an opportunity for me to sort of relax and feel supported[.]" Tr. 161. In April 2020, she testified that she tried to go to Michigan twice a year, and she would spend the trip sitting around with her mother. Tr. 127.

Plaintiff testified in 2017 that she made her own meals and did her own grocery shopping. Tr. 161. She split chores with her housemate. Tr. 162. She testified that chores and caring for herself took up most of her time, and she did not go out much. Tr. 162. She did try to go out with a friend once a week, but she did not have as many friends as she used to. Tr. 162-163. At her hearing in April 2020, she testified that she continued to drive to shop and go to appointments until the pandemic hit. Tr. 113-114. She continued to make her own meals and split chores with her housemate. Tr. 122. She testified that she cooked when she had the energy and tried to make meals that she could eat over multiple days. Tr. 125. She continued to talk to her mother on the phone daily. Tr. 125. She continued to try to meet up with friends once or twice a month. Tr. 128. At her hearing in 2023, Plaintiff testified that she now lived alone and that things were "more difficult without a housemate." Tr. 2245. She testified that she prepared one meal a day and shopped for groceries. Tr. 2245. She continued to try to meet up with a friend once a month. Tr. 2246.

Plaintiff first argues that she "did not allege, and was not required to demonstrate, that she was totally disabled." Pl. Op. Br. 12 (citing *Grigsby v. Saul*, 845 F. App'x. 657, 658 (9th Cir. 2021)). Plaintiff is correct that she need not show total incapacity. The question is whether her activities as performed are inconsistent with her allegations about how her symptoms limit her. Plaintiff's testimony about her part-time work is consistent with her allegations about her symptoms. Plaintiff testified to working between 10 and 15 hours per week at her various part-

time jobs, and 20 hours per week on rare occasions at one of them. She testified that even at that level of work, she would become exhausted and sometimes needed to cancel her shifts. She spent a lot of time in bed resting when she was not working. Her work and testimony are consistent. See *Hostrawser v. Astrue*, 364 F. App'x 373, 377 (9th Cir. 2010) (ALJ erred in discounting claimant's testimony about his back pain based on part-time light plumbing work that did not rise to the level of substantial gainful activity because that work was consistent with the claimant's testimony that he did occasional jobs when he was physically able).

The record supports Plaintiff's testimony about her part-time work. *E.g.*, Tr. 939 (April 2014 report to provider that she was "not doing too much work"), 985-986 (February 2017 reports to acupuncturist that she got tired easily after work and that part-time work was having a mild impact on ability to get enough rest), 992 (January 2017 report that she needed longer to recover after work obligations), 994 (December 2016 report that she felt generally exhausted doing a minimal amount of work), 1096 (September 2018 report that she started a new job selling coffee a few days a week because it was less stressful than running her business), 1154 (February 2017 report that if she works 20 hours shopping, she sleeps for over 10 hours the next day), 1386 (December 2017 report that work obligations were interfering with her ability to get enough rest), 1432 (July 2017 report that she worked too much one day and felt hungover the next day), 1439 (July 2017 report that after working 6 hours one day she spent all of the next day resting), Tr. 1574 (March 2017 report that Plaintiff felt exhausted after working 5-hour shifts at her business and had to stop). The manner in which Plaintiff performed her part-time work supports her argument that she cannot work 40 hours per week because of her fatigue.

Nor is Plaintiff's travel a valid reason to discount her symptom testimony. While the ALJ noted Plaintiff's trip abroad with an ex-boyfriend, Plaintiff testified that she ended up having to

go to the hospital. That course of events does not support a finding that she can work. As for her

trips to Michigan, Plaintiff testified that she went and sat at her mother's house. The description

of her trips is consistent with her testimony about her fatigue. Plaintiff's reports about her travel

to her providers are also consistent with her testimony. In January 2017, she told her

acupuncturist that her body needed more time to recover from travel and work obligations. Tr.

992. In January 2018, she reported that she had "[g]eneralized fatigue following holiday

travel[.]" Tr. 1381. In May 2019, Plaintiff told a provider that she traveled because her mother

was in the hospital and stated that she felt "run down." Tr. 1254. Plaintiff's ability to

occasionally travel to visit family without doing high-exertion activities and with an increase in

symptoms afterward does not undermine her testimony about her fatigue.

Finally, Plaintiff's activities of daily living such as chores and cooking do not undermine

her symptom testimony. For much of the relevant period, Plaintiff had a housemate with whom

she split the chores. She testified that chores and personal care took up a lot of her time. Once

she was living alone, Plaintiff testified that her chores became more challenging. She testified

that she cooked meals she could store and eat over multiple days. This testimony is consistent

with her testimony about her fatigue, which she stated was worse some days than others.

Defendant argues that the ALJ's interpretation of Plaintiff's activities was rational. Def.

Br. 10, ECF 9. Defendant relies on *Smartt v. Kijakazi*, 53 F.4th 489, 499-500 (9th Cir. 2022). In

*Smartt*, the claimant alleged that she had constant 10/10 pain, but testified that she cooked,

cleaned, shopped, cared for her daughter, did laundry, and did other chores. *Id.* Given the

extreme nature of the claimant's allegations in *Smartt*, the ALJ reasonably discounted them

based on her activities. Here, Plaintiff did not allege constant 10/10 pain or fatigue, but rather

that she could work a shift but would be fatigued the next day. Her activities are consistent with

that testimony. In sum, the ALJ erred in relying on Plaintiff's activities in discounting her symptom testimony.

B.      Course of Treatment

The ALJ discounted Plaintiff's testimony based on the efficacy of treatment, as well as Plaintiff's noncompliance with treatment and failure to seek treatment. Relevant factors for the ALJ to consider when evaluating symptom testimony include "[t]he type, dosage, effectiveness, and side effects of any medication" the plaintiff takes to alleviate symptoms, as well as treatment besides medication that relieves symptoms, and other measures used to relieve pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(iv)-(vi). "[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability." *Wellington v. Berryhill*, 878 F.3d 867, 876 (9th Cir. 2017). *See also Kitchen v. Kijakazi*, 82 F.4th 732, 739 (9th Cir. 2023) (holding that the ALJ reasonably discounted the claimant's symptom testimony based on "a gradual improvement in his functioning with prescribed medication and psychotherapy sessions").

An ALJ may consider a claimant's "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment[.]" *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). "[I]f a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated...." *Chaudhry v. Astrue*, 688 F.3d 661, 672 (9th Cir. 2012) (internal quotations omitted).

The ALJ recognized that several of Plaintiff's severe impairments might be expected to cause fatigue, including POTS, pernicious anemia, her thyroid conditions, and her neuroendocrine tumors. *See* Tr. 2198-2200. The ALJ noted both improvement with treatment and a failure to pursue certain treatments. Tr. 2200.

The ALJ found that Plaintiff's energy levels improved with acupuncture. Tr. 2198. Plaintiff testified in 2017 that she saw an acupuncturist twice a week. Tr. 167. She submitted acupuncture records dating back to 2013. She repeatedly reported to her acupuncturist in 2013 and 2014 that the treatment helped her feel better and improved her energy. Tr. 786, 790, 795, 798, 799, 803, 804, 809, 810, 812, 813. In September 2013, Plaintiff reported that she was very happy with how her energy had improved, as it was at least 50% better. Tr. 795. Later that month, she reported feeling 75% better overall. Tr. 798. In July 2014, one of Plaintiff's doctors noted that acupuncture "dramatically helped energy." Tr. 824. In June 2015, a physician wrote that Plaintiff's "symptoms gradually improved but waxed & waned and although she has had periods when she was more severely fatigued, anxious and stressed subsequent to this, regained moderate functionality." Tr. 894. In November 2016, one of her naturopaths reported that Plaintiff felt "better – more stable" and that acupuncture "seems to be working well." Tr. 975.

Plaintiff continued to attend regular acupuncture sessions at least between March 2017 and March 2020. During that time, she reported periods of improved energy as well as periods of lower energy. Tr. 1469, 1467, 1466, 1465, 1464, 1459, 1456, 1454, 1452, 1451, 1448, 1447, 1446, 1441, 1440, 1439, 1438, 1434, 1432, 1431, 1423, 1422, 1414, 1411, 1407, 1406, 1404, 1403, 1399, 1387, 1381, 1375, 1372, 1371, 1262, 1357, 1353, 1345, 1328, 1324, 1322, 1321, 1319, 1318, 1315, 1313, 1309, 1307, 1296, 1287, 1283, 1281, 1273. Plaintiff reported to her acupuncturist in December 2018 that she felt she had reestablished a relative baseline of health, but she still did not feel well. Tr. 1307. The ALJ did not err in finding that Plaintiff's symptoms improved with acupuncture, but the relevant baseline for improvement is the period after the onset of Plaintiff's symptoms in late 2010.

Plaintiff's acupuncture records reflect that while she improved from the early period after her symptoms first manifested, she continued to report problems with fatigue. In particular, Plaintiff usually reported fatigue after participating in social outings or working more. Tr. 1456 (more work over weekend led to poor sleep and adrenal fatigue), 1448 (long workday on Sunday led to energy hangover and brain fog), 1432 (too much work on Saturday led to feeling of being hungover), 1406 (energetic exhaustion and pain after staying up late talking to a friend), 1404 (exhausted for several days after attending a party over the weekend), 1380 (weekend in Seattle led to less of a crash than in the past), 1339 (feeling "run down" after attending a music festival). However, in May 2017, she reported feeling strong despite walking three miles. Tr. 1451. As one of Plaintiff's providers recognized, Plaintiff's fatigue symptoms waxed and waned over time, and she regained a moderate level of functionality. The ALJ did not err in concluding that Plaintiff's symptoms improved with acupuncture, but that improvement was from a low baseline after the onset of her symptoms. The medical record continues to document complaints about significantly limiting fatigue, particularly after Plaintiff tried to exert herself. That is consistent with Plaintiff's testimony about her fatigue.

The ALJ found that Plaintiff did not report any symptoms from POTS. Tr. 2199. Plaintiff was diagnosed with POTS in September 2015 after a positive tilt table test. Tr. 911. The ALJ found that Plaintiff denied symptoms from POTS in April 2016. Tr. 2199 (citing Tr. 1032). In April 2016, Plaintiff consulted with a naturopathic doctor about her history of chest pain. Tr. 1031. She did not report decreased exercise tolerance or increased shortness of breath, and did not believe the pain came from her heart. Tr. 1031-1032. She reported occasional isolated palpitations felt as hard beats and denied a racing pulse, shortness of breath, or edema. Tr. 1032.

She reported a strong history of syncope in 2011, but not since then, and denied present

symptoms from POTS. Tr. 1032. The ALJ's interpretation of this visit note is reasonable.

The ALJ also found that Plaintiff's "doctors state that the symptoms that were attributed

to POTS, Lyme disease, and other impairments were, in fact, due to the neuroendocrine tumor's

hormone function and surrounding inflammation." Tr. 2199. After Plaintiff was diagnosed with

carcinoid tumors in late 2019, one of Plaintiff's physicians, Dr. Katherine Lopez Sankey, wrote

in April 2020 that "[c]arcinoid tumors excrete hormones that affect many aspects of [Plaintiff's]

body systems . . . in an unpredictable way." Tr. 1737. Dr. Sankey opined that with the diagnosis

of the carcinoid, "it is likely that she does not have POTS or chronic Lyme, and her symptoms

stem from the tumors, their surrounding inflammation, and the hormones they secrete." Tr. 1737.

The ALJ accurately reported this opinion.

However, the record shows that Plaintiff's providers, including Dr. Sankey, later

concluded that POTS *was* a cause of her symptoms. In July 2021, Plaintiff met with a

naturopathic doctor, Dr. Guggenheim, at Oregon Health & Science University for pain

management consulting after she was referred by a physician. Tr. 3627. After reviewing

Plaintiff's account of her symptoms, prior medical records, and laboratory and radiology reports,

Dr. Guggenheim concluded that POTS "is likely further contributing to GI dysmotility, as well

as chronic fatigue, exertional intolerance." Tr. 3643. Dr. Guggenheim wrote that Plaintiff's

"POTS was never addressed. She was prescribed propranolol but her blood pressure was too

low." Tr. 3629. Plaintiff did recumbent exercise at home, and she tried compression socks, but

they were not helpful. Tr. 3629. Plaintiff tried stimulants and neurofeedback, but "[t]hese

treatments caused worsening symptoms." Tr. 3629. Dr. Guggenheim discussed "first line

conservative POTS treatment" with Plaintiff. Tr. 3643. This treatment consisted mostly of

dietary and lifestyle changes, as well as certain exercises. Tr. 3643. Plaintiff agreed to the plan. Tr. 3643. And in October 2022, Dr. Sankey opined that POTS was the most likely cause of Plaintiff's fatigue, lightheadedness, and palpitations. Tr. 2668. The record shows that Plaintiff's providers were uncertain about the cause of her symptoms in the wake of her cancer diagnosis, but ultimately concluded that POTS was at least a cause of her fatigue, though not necessarily the only cause.

Plaintiff's testimony about her POTS is consistent with the record. Plaintiff testified in December 2020 that she had been prescribed medication to treat her POTS, but she had low blood pressure, and her primary care provider was worried that it would lower her blood pressure. Tr. 84. She testified that she did wear compression stockings and did not notice much difference other than when she was on her feet, so she wore them occasionally, but they did not reduce her symptoms. Tr. 84. The record shows that Plaintiff tried various treatments for her symptoms, which were largely ineffective or even harmful. It does not show that she failed to seek treatment or that she refused viable treatments recommended by a provider. Given the uncertainty surrounding the cause of Plaintiff's symptoms, which the ALJ recognized in his decision, Plaintiff's failure to find the right treatment sooner cannot reasonably serve to discount her symptom testimony.

With respect to Plaintiff's thyroid conditions, the ALJ stated that Plaintiff "intermittently uses thyroid replacement." Tr. 2199. In 2017, Plaintiff testified that she tried a thyroid medication and it did not work. Tr. 168. In December 2020, she testified that she was taking levothyroxine for her thyroid, and that she had not taken it before because it had given her profuse sweating and anxiety. Tr. 83. Plaintiff reported to a naturopath in July 2016 that she was taking a thyroid medication, and it gave her profuse sweating. Tr. 1125. She told another

naturopath the same in August 2016. Tr. 974. Plaintiff's acupuncturist recorded in February 2017 that Plaintiff had tried taking a low dose of a dissected thyroid supplement, but she felt it caused her low-grade anxiety, irritation, and tension in her chest. Tr. 985. A naturopath recorded in March 2017 that Plaintiff had tried to start thyroid medication again, but she never did well on it because she "[g]ets very agitated." Tr. 979. The record shows that Plaintiff tried to treat her thyroid conditions in various ways, but the treatments caused side effects. This does not serve to undermine her testimony.

The ALJ noted that Plaintiff had pernicious anemia and that in 2020 she was taking B12 supplements to treat the condition. Tr. 2199. Plaintiff testified in 2023 that between 2011 and 2013, she was trying to take oral iron to treat her anemia. Tr. 2239. She later began doing iron infusions. Tr. 2240. In May 2011, Plaintiff's anemia was recorded as stable on 5000 mcg of oral iron. Tr. 687. In July 2014, Plaintiff reported that she was taking iron and wondered if it had caused her increase in energy. Tr. 826. She was still taking the supplements in May 2015 and denied symptoms of anemia, noting that she had her iron levels checked annually. Tr. 872. In March 2017, Plaintiff's iron was recorded as very low. Tr. 979. In August 2017, it finally increased. Tr. 1579. In November 2018, her iron levels had increased naturally without supplements. Tr. 1311. In June 2019, Plaintiff's iron levels were declining although she was taking oral iron, and she agreed to try iron infusions. Tr. 1260.

In July 2019, it appeared the iron infusion had contributed to slightly better energy and less fatigue. Tr. 1283. But in October 2019, Plaintiff's acupuncturist recorded that she was off all iron supplements, and the iron infusions had not been successful in resolving her anemia. Tr. 1279. In February 2020, a physician wrote that Plaintiff had not been taking oral iron because it gave her an upset stomach. Tr. 2094. A September 2020 visit note reiterated this. Tr. 2158. The

same visit note recorded "transient improvement of ferritin" on Venofer. Tr. 2158. In October

2020, one of Plaintiff's providers recorded that Plaintiff had four infusions of Venofer, and woke

up after the fourth one with a puffy, swollen face. Tr. 1941. Plaintiff also reported palpitations,

bloating, and nausea. Tr. 1941. In November 2020, Plaintiff was taking slow iron and appeared

to be tolerating it well. Tr. 1938. In July 2021, she scheduled iron infusions. Tr. 2660. In April

2022, Plaintiff was considering iron infusions, but was worried about the effects on her heart. Tr.

3910. A nurse responded that tachycardia was a potential side effect of most iron infusions. Tr.

3911. In May 2022, Plaintiff had an infusion of Infed. Tr. 3585. She reported two months later

that it did not have a major impact on her fatigue. Tr. 3370.

       The ALJ gave significant weight to the testimony of Alvin Stein, MD, an independent

medical expert who testified at Plaintiff's December 2020 hearing. Tr. 2203. The ALJ noted Dr.

Stein's testimony that Plaintiff had other options for treating her anemia that she had not

pursued. Tr. 2203. Dr. Stein testified that Plaintiff's iron deficiency was "largely going

untreated." Tr. 63. He noted that Plaintiff had reported facial swelling as a side effect from

intravenous iron. Tr. 63. He suggested that Plaintiff try a different brand of intravenous iron. Tr.

64. Because the ALJ gave great weight to this testimony, it serves as part of the ALJ's reasoning

to discredit Plaintiff's testimony about her anemia. Plaintiff began taking slow iron in November

2020, right before Dr. Stein testified at her December 2020 hearing, so her anemia was being

treated at that time. And the record shows that she took iron supplements until they began giving

her an upset stomach. Dr. Stein did not appear to note—and nor did the ALJ—that in addition to

a puffy face from Venofer, Plaintiff reported palpitations, bloating, and nausea. Faced with this

array of side effects, it was reasonable for Plaintiff to avoid Venofer. SSR 16-03p ("An

individual may not agree to take prescription medications because the side effects are less

tolerable than the symptoms."). This is particularly true given that Plaintiff was diagnosed with POTS, a heart condition, and palpitations were a side effect of Venofer. She later tried a different brand of infusion, Infed, but it did little to help.

The record shows that Plaintiff tried to increase her iron levels through many different treatments throughout the relevant period. While the ALJ found that Plaintiff did not adequately treat some of her conditions because she relied too heavily on natural remedies, that reasoning, valid or not, cannot apply to her anemia. Plaintiff tried the same remedies that Dr. Stein advocated. Most of the treatments were either unsuccessful or caused intolerable side effects. Plaintiff's treatment of her anemia is not a valid basis to discount her testimony about fatigue.

The ALJ found Plaintiff's statements about her neuroendocrine tumor partially supported by her treatment records. Tr. 2199. On October 1, 2019, Plaintiff had an endoscopic ultrasound, and a tumor was removed. Tr. 1085. She had another procedure on January 22, 2020, and another polyp was located. Tr. 1085. Both polyps were biopsied and found to contain neuroendocrine tumor. Tr. 1085. Two surgeons, one of whom performed the procedure, recommended that Plaintiff continue surveillance every six months, and she agreed to this recommendation. Tr. 1739, 1744.

In March 2020, Plaintiff met with two different physicians about how to proceed with treatment of her tumors. Tr. 1084. One of the physicians, Dr. Hansen, wrote, "This is a little bit of a challenging situation," and "these lesions typically have a fairly benign course, however can occasionally behave in a malignant fashion." Tr. 1084. Dr. Hansen wrote that Plaintiff had three options: "observation, local wedge excision, or subtotal gastrectomy." Tr. 1084. He wrote that Plaintiff was "quite resistant to the concept of surgery given her overall picture, especially being

tall and thin with difficulty maintaining weight currently." Tr. 1084. Dr. Hansen intended to seek a second opinion about how Plaintiff should proceed. Tr. 1084.

Plaintiff testified in December 2020 that she was in the process of getting a second opinion about the stomach surgery after one provider recommended it. Tr. 86. She stated that an expert in neuroendocrine tumors advised against the surgery and told her that frequent endoscopies were a better approach. Tr. 87. She explained that because of the divergent opinions, she was seeking a third opinion. Tr. 87. Plaintiff also stated that she tried to go to a specialty cancer institute for a procedure, but her request was denied. Tr. 88. Plaintiff's testimony is consistent with the treatment record. In March 2020, shortly after meeting with her physicians, Plaintiff told her acupuncturist that she was seeking advice from other practitioners and specialists about surgery because the board of surgeons recommended removing three quarters of her stomach. Tr. 1269. In April 2020, Plaintiff's physician, Dr. Sankey, wrote that an oncologist had recommended removal of most of Plaintiff's stomach tissue, and Plaintiff was seeking a second opinion. Tr. 1737. In August 2020, Dr. Sankey wrote that Plaintiff had seen a specialist in neuroendocrine tumors who recommended endoscopic surveillance every 6 months to monitor for dysplasia. Tr. 2064. *See also* Tr. 2479. Dr. Sankey also wrote that Plaintiff had contacted the Memorial Sloane Kettering Cancer Center for a referral to get a second opinion. Tr. 2064. In December 2020, Dr. Sankey wrote that Plaintiff sought an opinion from "Oregon's premier carcinoid specialist, who has recommended repeat tumor removal using endoscopies, rather than removing her stomach." Tr. 2654.

The ALJ gave significant weight to Dr. Stein's testimony. Tr. 2203. Dr. Stein noted the recommendation of a gastrectomy and recommended that Plaintiff have the surgery to prevent the tumors from metastasizing. Tr. 60, 70. The ALJ recognized that Plaintiff had had surgery to

remove tumors and pursued "medical opinions corollary to her gastrointestinal problem[.]" Tr. 2202. He wrote that Plaintiff did not consult specialists such as an endocrinologist, and wrote, "Her failure to pursue more specialist medical treatment or opinion related to these complaints suggests her symptoms are not as severe as she claims." Tr. 2202. But the record shows that Plaintiff consulted multiple specialists about her tumors. And where a specialist in neuroendocrine tumors recommended surveillance and repeat endoscopies, it was reasonable for Plaintiff to either follow this advice or to seek additional opinions before pursuing surgery. Given the drastic nature of the surgery and conflicting medical advice, it was reasonable for Plaintiff not to immediately proceed. *See* 20 C.F.R. § 404.1530(c)(4) (it is acceptable not to follow prescribed treatment if the treatment is very risky for the claimant due to its magnitude, unusual nature, or other reason). The record shows that Plaintiff was concerned about her ability to maintain weight if she had most of her stomach removed. Tr. 1084, 2094. The record also shows that Plaintiff was already struggling to maintain her weight and that her doctors considered her underweight. Tr. 1084, 2063, 2094. This concern was reasonable. Plaintiff's course of treatment of her neuroendocrine tumors cannot reasonably be interpreted to support a finding that Plaintiff overstated her symptoms.

The ALJ relied heavily on the nature of Plaintiff's treatments in discounting her testimony. The ALJ noted that Plaintiff had tried some prescription medications and stated, "Generally, however, she does not pursue conventional Western medicine treatments, preferring to seek treatment with natural medicine." Tr. 2199. The ALJ also stated, "For much of the period of alleged disability, the claimant took a panoply of vitamins and herbs, but took no pharmaceutical or prescription medications." Tr. 2202. The ALJ stated:

> She explains that the reason she pursues natural remedies is that she has some allergies to ingredients and feels that she is sensitive to medications. Since then,

she has trialed some medications, but has not settled on a regime. Her failure to aggressively pursue medically acceptable treatments suggests that her symptoms are not as severe as she claims they are.

Tr. 2202.

The ALJ's reasoning misses the point. The treatment record reasonably supports a finding that the naturopathic remedies were not very helpful. *E.g.*, Tr. 1476 (documenting side effects from some of the natural remedies). It does not, however, support a finding that Plaintiff was overstating or exaggerating her symptoms. The ALJ correctly stated that Plaintiff tried numerous natural remedies. *E.g.*, Tr. 1267-1268 (2016 medication list). But Plaintiff also took several conventional treatments. She also consulted many providers, to the point that in April 2016, one of them told her she was consulting too many. Tr. 1119. As for Plaintiff's testimony about side effects, a gastroenterologist wrote that Plaintiff "indeed does have a sensitivity to medications." Tr. 2509. As discussed above, multiple providers recorded Plaintiff's poor reaction to various forms of iron and to thyroid medications throughout the relevant period. Plaintiff tried various other conventional treatments that were not effective, some of which also caused side effects. *E.g.*, Tr. 2509 (high doses of Miralax did not alleviate constipation), 2656 (unclear that Ritalin was helping with symptoms, but it did make Plaintiff sleepy), 2668 (Ritalin made Plaintiff feel "amped up" in a way that was not helpful at work, but unclear that it improved focus), 3264 (Motegrity gave Plaintiff insomnia).

The ALJ noted Plaintiff's failure to take pyridostigmine as prescribed. Tr. 2199. Plaintiff was prescribed pyridostigmine in July 2021. Tr. 3905. In April 2022, Dr. Guggenheim recorded that Plaintiff stopped taking pyridostigmine because it caused sudden urinary urgency and urine loss. Tr. 3921. Plaintiff restarted the medication in early 2022 and slowly tapered up her dose, but "started to develop abdominal pain and hand cramping," as well as tightness in her shoulders.

Tr. 3921. The symptoms went away 48 hours after she stopped taking pyridostigmine. Tr. 3921. The medication was listed as discontinued in July 2022. Tr. 3905. The ALJ did not acknowledge Plaintiff's reason for stopping the medication. The record shows that Plaintiff tried to take pyridostigmine twice and developed side effects both times. Her decision not to continue with the medication is not a basis to discount her symptom testimony.

Plaintiff testified in December 2020 that she tried medications. Tr. 83. She stated that she was taking levothyroxine for her thyroid and tacrolosate for stomach pain, though the latter was not very effective. Tr. 83. She testified that she did not take the thyroid hormone until recently because it had given her profuse sweating and anxiety. Tr. 83. She testified that she tried other thyroid medications. Tr. 83-84. Plaintiff stated that in 2011 she was prescribed an antidepressant and declined it because her condition was new and she did not believe it was necessary at that point, but "in retrospect, I probably should have taken it." Tr. 84. She testified that she was just prescribed Adderall. Tr. 84. She explained that she had been prescribed a medication to treat her POTS, but she had low blood pressure, and her primary care provider was worried that it would lower her blood pressure. Tr. 84. She testified that she did wear compression stockings and did not notice much difference other than when she was on her feet, so she wore them occasionally, but they did not reduce her symptoms. Tr. 84. Plaintiff stated that she had recently done iron infusions and developed side effects, and was trying to find other ways to get iron. Tr. 85. She testified that the medications she stopped taking were ones that gave her reactions. Tr. 86.

Plaintiff's testimony is consistent with the medical records, which document that while some treatments were effective, many others either were ineffective, caused side effects, or both. The ALJ largely failed to acknowledge this. The treatments Plaintiff tried, both conventional and naturopathic, and her consultation of numerous providers, both naturopathic and conventional,

support her allegations about the degree of her symptoms. No medical records indicate that her providers thought her symptoms were unfounded. Other than Plaintiff's testimony that she declined an antidepressant in 2011, shortly after the onset of her symptoms, nothing in the record suggests that Plaintiff declined Western medicine because she believed she did not need it. It is not clear and convincing to discount a claimant's subjective testimony simply because the claimant follows a course of treatment that does not fully conform to conventional Western standards. *See Putz v. Astrue, 371 F. App'x 801, 803 (9th Cir. 2010)* ("Putz's reliance on naturopathic care does not defeat her claim.").

The ALJ also stated that Plaintiff's "records do not reflect treatment with any rheumatologist, infectious disease expert, endocrinologist, neurologist or the like, contrary to what would be expected of someone with chronic headaches or autoimmune-like complaints, or someone who did not tolerate thyroid replacement medicine well." Tr. 2202. In her opening brief, Plaintiff disclaims the argument that her fatigue was caused by her Hashimoto's thyroiditis, instead arguing that it was caused by her neuroendocrine tumors and pernicious anemia. Pl. Op. Br. 15. She argues that the specialists the ALJ listed would not be useful. *Id.* The record indicates that any of Plaintiff's severe impairments may contribute to her fatigue. As discussed above, Plaintiff consulted a wide range of both conventional and naturopathic practitioners, including specialists. The ALJ recognized that Plaintiff saw a pain specialist. Tr. 2202. The ALJ identified no point in the record where Plaintiff was advised to consult with a specialist and failed to do so, which could indeed be a sign that Plaintiff's complaints were less serious than she alleged. As Plaintiff was under treatment for several conditions that were believed to be the cause of her symptoms, it was not reasonable for the ALJ to conclude that failure to consult specialists that no provider directed her to consult was a basis to discount her

symptom testimony. In sum, the ALJ erred in discounting Plaintiff's testimony about her fatigue based on her course of treatment.

C.        Objective Medical Record

An ALJ may discount a claimant's testimony based on a lack of support from objective medical evidence, but this may not be the sole reason. *See Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005) (holding that "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain."); *Taylor v. Berryhill*, 720 F. App'x 906, 907 (9th Cir. 2018) (explaining that a "lack of objective medical evidence cannot be the sole reason to discredit claimant's testimony," and therefore holding that the ALJ failed to provide clear and convincing reasons for discounting the claimant's testimony) (citation omitted); *Heltzel v. Comm'r of Soc. Sec. Admin.*, No. 19-1287, 2020 WL 914523, at *4 (D. Ariz. Feb. 26, 2020) (stating that "[b]ecause the ALJ's other reasons for rejecting Plaintiff's testimony were legally insufficient, a mere lack of objective support, without more, is insufficient to reject Plaintiff's testimony."). However, "[w]hen objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony." *Smartt*, 53 F.4th at 498.

In 2017, Plaintiff testified that she thought she had Lyme disease and went to a support group for it. Tr. 168. The ALJ found that Plaintiff did not have Lyme disease because she tested negative. Tr. 2198. This was correct. Plaintiff was treated for Lyme disease, but testing was negative. Tr. 687. Some of Plaintiff's providers, such as one of her acupuncturists, recorded that Plaintiff had Lyme disease. *E.g.*, Tr. 810. Another provider noted that the Lyme test was positive on one band but not on all. Tr. 825. The ALJ reasonably concluded that Plaintiff did not have

Lyme disease. The ALJ instead attributed the symptoms of fevers, sweats, and chills to Plaintiff's neuroendocrine tumors. Tr. 2198. Plaintiff does not challenge this.

The ALJ found Plaintiff's statements about her neuroendocrine tumor partially supported, noting normal physical examinations in October and November 2020 and no sign of recurring tumors. Tr. 2199. The Court need not assess whether the ALJ erred in relying on the physical examinations because the ALJ did not rely on any other valid basis for discounting Plaintiff's testimony. Regardless, given the longitudinal record, two normal physical examinations only one month apart would not constitute substantial evidence. In sum, the ALJ erred in discounting Plaintiff's testimony about her fatigue.

## II.    Medical Opinion Evidence

Because Plaintiff's claims were filed before March 27, 2017, the previous regulations govern evaluation of the medical opinion evidence. The prior regulations recognized three types of physicians: (1) treating, (2) examining, and (3) nonexamining. *Holohan*, 246 F.3d at 1201-02; *Lester*, 81 F.3d at 830. Generally, more weight is given to the opinion of a treating physician than to the opinions of those who do not actually treat the claimant. *Id.*; 20 C.F.R. §§ 1527(c)(1)-(2), 416.927(c)(1)-(2).

If the treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. *Orn*, 495 F.3d at 631; *Holohan*, 246 F.3d at 1202. If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the ALJ must still articulate the relevant weight to be given to the opinion under the factors provided for in 20 C.F.R. §§ 1527(c)(2), 416.927(c)(2). *Orn*, 495 F.3d at 631. "If a treating or examining

doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation omitted). Specific and legitimate reasons for rejecting a physician's opinion include finding that the opinion is "brief, conclusory, and inadequately supported by clinical findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *see also Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ may "permissibly reject[] . . . check-off reports that [do] not contain any explanation of the bases of their conclusions").

For claims filed before March 27, 2017, acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech pathologists. 20 C.F.R.§§ 404.1513(a), 416.913(a) (2013). Nurse practitioners, physician's assistants, chiropractors, audiologists, and therapists are non-acceptable medical sources or "other medical sources." 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1) (2013). Still, the Social Security Administration (SSA) has recognized that

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.

Soc. Sec. Ruling (SSR) 06-03p, available at 2006 WL 2329939, at *3.

While opinions from non-acceptable medical sources may not be given controlling weight, their opinions may be used in determining the "severity of the individual's impairment(s) and how it affects the individual's ability to work." *Id.* at *2; 20 C.F.R. § 404.1513(d). The ALJ may reject the competent testimony of other medical sources for reasons "germane to the witness." *Molina*, 674 F.3d at 1111. Germane reasons may include a finding that the testimony is

conclusory, provides little explanation of the evidence relied on, is not supported by the medical record, or is inconsistent with a medical opinion from an acceptable medical source. *Id.*

"Depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source[.]'" SSR 06-03p, 2006 WL 2329939, at *5. The factors to be applied are: the length of relationship and frequency of contact; the level of consistency with other evidence of record; the degree to which the source presents relevant evidence to support an opinion; quality of opinion explanation; specialty area expertise, if applicable; and any other factors that tend to refute the opinion. *Id.* at *4-*5.

Plaintiff challenges the ALJ's assessment of the medical opinions of several of her treating naturopaths: Dr. Means, Dr. Bodeen, and Dr. Messinger. Pl. Op. Br. 8. Plaintiff also argues that substantial evidence does not support the ALJ's assessment of Dr. Stein's opinion. *Id.* at 9. Plaintiff does not dispute that her naturopaths are not acceptable medical sources under the controlling regulations. Pl. Reply 4, ECF 10. Dr. Stein is an acceptable medical source, but he was not a treating physician. Thus, none of these opinions is presumptively entitled to controlling weight.

A.    Dr. Means

Dr. Jennifer Means, ND, one of Plaintiff's treating naturopaths, submitted a medical source statement on March 3, 2017. Tr. 1052-1054. Dr. Means stated that she had been Plaintiff's primary care provider since April 2014. Tr. 1052. She wrote that Plaintiff suffered from chronic fatigue, brain fog, POTS, leukopenia, recurrent fevers, and anxiety. Tr. 1052. She wrote that Plaintiff's primary symptoms were "fatigue after activities, trouble with thinking clearly, word finding, light headedness, tachycardia, recurrent fevers." Tr. 1052.

Dr. Means opined that Plaintiff could occasionally lift up to 5 pounds, stand or walk up to 45 minutes at a time, stand or walk 3 hours in a workday (but could only work 5 hours), and could sit 1 hour at a time and 3 hours in an 8-hour day. Tr. 1053. Dr. Means wrote that Plaintiff needed to lie down because of her POTS, which gave her symptoms of dizziness, brain fog, tachycardia, and fatigue. Tr. 1053. Plaintiff needed a 15-minute break every 2 hours. Tr. 1053. Dr. Means wrote that simple tasks could cause Plaintiff anxiety and overwhelm her. Tr. 1054. She estimated that Plaintiff would have impaired attention and concentration for 50-60% of a standard workweek. She wrote that Plaintiff would miss 16 hours of work per month because of her conditions, noting that Plaintiff missed two 5-hour shifts per month while working 20 hours a week because of her exhaustion and brain fog. Tr. 1054.

In March 2020, Dr. Means submitted a second medical source statement. Tr. 1077-1079. She again wrote that Plaintiff's "persistent severe fatigue" was one of her main symptoms. Tr. 1077. She wrote that Plaintiff would miss at least 16 hours of work per month because of her symptoms, stating, "Fatigue is intermittent, can work 4-6 hour shifts with 30 minute breaks 1-2 times per day. Max = 20 hours per week with possible exacerbations." Tr. 1077. She estimated that Plaintiff's attention and concentration would be impaired for 50% of the workweek. Tr. 1077. Plaintiff could occasionally lift up to 10 pounds, stand or walk up to 1 hour at a time, and up to 4 hours in a workday with breaks. Tr. 1078. She could sit 4 hours at a time and 4 hours in a workday. Tr. 1078. Dr. Means wrote that Plaintiff would have a hard time doing repetitive tasks and needed to change positions frequently. Tr. 1078.

The ALJ gave Dr. Means' opinion little weight because it was inconsistent with Plaintiff's activities. Tr. 2205. The ALJ stated that "[m]any of the listed diagnoses were not diagnosed by an acceptable medical source." Tr. 2205. The ALJ also noted that naturopaths are

not acceptable medical sources and therefore are entitled to less deference. Tr. 2205. Plaintiff challenges the ALJ's assessment of Dr. Means' opinion about how much work Plaintiff would miss per month. Pl. Op. Br. 8. As discussed above, Plaintiff's activities are consistent with the account of her symptoms. They are consistent with Dr. Means' opinion that Plaintiff could work no more than 20 hours per week because of her fatigue and that she would miss at least 16 hours of work per month. In arguing otherwise, Defendant points to an instance in which Plaintiff told a social worker that she did not have enough hours at her part-time job. Def. Br. 4 (citing Tr. 2677). But Plaintiff did not state how many hours she was working or how many hours she wanted to work, so there is no basis to infer that she wanted to work full-time, or even more than 20 hours per week. Further, Plaintiff made the statement in November 2022, well after Dr. Means issued her opinion. The ALJ already found that Plaintiff was disabled beginning May 9, 2022.

Next, while the ALJ stated that many of the listed conditions were not diagnosed by an acceptable medical source, the record shows that Plaintiff reported fatigue to both her naturopaths and physicians, who credited that report, and the ALJ found that "the existence of some fatigue is expected." Tr. 2200. Further, Dr. Means listed POTS, pernicious anemia, and neuroendocrine tumors, which the ALJ recognized as severe impairments, and which are conditions that could be expected to cause fatigue. Finally, simply stating that Dr. Means was not an acceptable medical source is not a germane reason to discount her opinion. *See Pelletier v. Berryhill*, No. ED CV 16-591-SP, 2017 WL 3269377, at *5 (C.D. Cal. July 31, 2017) (concluding that such a reason was not germane to the witness because it amounted to the wholesale rejection of all sources that are not acceptable medical sources). The ALJ failed to identify valid germane reasons to discount Dr. Means' opinion.

Defendant points out that both the consultative examiner and the state agency medical consultants did not find that Plaintiff would be off task or absent at all. Def. Br. 4-5. The ALJ gave the consultative examiner's opinion little weight and the agency consultants' opinions some weight, but assessed more limitations than the latter did. Tr. 2204. The ALJ relied on Plaintiff's activities in giving some weight to the agency consultants' opinion. Tr. 2204. Plaintiff's activities do not indicate that she can work full-time, or more than 20 hours per week.

B.    Dr. Bodeen

Dr. Brooke Bodeen, ND, one of Plaintiff's treating naturopaths, submitted a medical source statement on March 14, 2017. Tr. 1071-1073. She wrote that she had treated Plaintiff since December 2015. Tr. 1071. Dr. Bodeen wrote that Plaintiff's primary symptoms were fatigue, brain fog, anxiety, feeling overwhelmed, neck pain, shoulder pain, and muscle soreness. Tr. 1071. Dr. Bodeen opined that Plaintiff could occasionally lift up to 5 pounds and frequently lift 2-3 pounds. Tr. 1072. Plaintiff could stand or walk for 30 minutes at a time and for 2 hours in an 8-hour day. Tr. 1072. Plaintiff could sit for 2.5 hours at a time and 5 hours in an 8-hour day. Tr. 1072. Plaintiff would need to lie down for up to an hour due to her orthostatic hypotension. Tr. 1072. Plaintiff needed to alternate sitting and standing, and she needed a 30-minute break every 3 hours. Tr. 1072. Dr. Bodeen estimated that Plaintiff's attention and concentration would be impaired 20% of the time in a standard workweek and that she could miss up to 4 days of work per month due to her symptoms. Tr. 1073.

The ALJ gave Dr. Bodeen's opinion little weight for the same reasons he gave for Dr. Means' opinion. Tr. 2205. The same analysis applies. The ALJ did not identify valid germane reasons to discount Dr. Bodeen's opinion.

C.      Dr. Messinger

In April 2020, Dr. Thomas Messinger, ND, one of Plaintiff's treating naturopaths, submitted a medical source statement. Tr. 1478-1480. He wrote that he treated Plaintiff for three years. Tr. 1478. Plaintiff testified that Dr. Messinger was her primary care doctor until approximately 2019. Tr. 118. Dr. Messinger wrote that Plaintiff's primary symptoms were severe fatigue, chronic headaches, chronic sore throat and ongoing low-grade fever, and cognitive impairment. Tr. 1478. Dr. Messinger expected Plaintiff to miss "a lot more than 16 hours" of work each month because of her symptoms. Tr. 1478. He expected Plaintiff's attention and concentration to be impaired at least 20% of the time, noting that she "has not worked 8 hour days for at least a few years." Tr. 1478. He opined that Plaintiff could occasionally lift up to 2 pounds. Tr. 1479. She could stand or walk up to 15 minutes at a time and 1.5 hours in an 8-hour day. Tr. 1479. She could sit for 2 hours at a time and up to 4 hours in an 8-hour day. Tr. 1479. She would need to recline due to her fatigue. Tr. 1479.

The ALJ gave Dr. Messinger's opinion little weight because it was inconsistent with Plaintiff's activities and because he was not an acceptable medical source. Tr. 2204. The ALJ did not specifically discuss Dr. Messinger's opinion. The ALJ erred in discounting the opinion for the same reasons he erred in discounting Dr. Means' opinion.

D.      Dr. Maki

Dr. Eric Maki, MD, performed a consultative examination of Plaintiff on May 23, 2015. Tr. 871-875. He conducted a physical examination of Plaintiff and recorded normal findings. Tr. 872-875. He assessed Plaintiff for Hashimoto's thyroiditis, Lyme disease or another infectious disorder, and pernicious anemia. Tr. 875. He found that none of these conditions was limiting based on objective medical findings. Tr. 875. He did note Plaintiff's subjective report of being

tired throughout the day and wrote that this "may interfere with daily activities, although not objectively." Tr. 875. He assessed no limitations in Plaintiff's ability to sit, stand, or walk, no postural or manipulative limitations, and no workplace environmental limitations. Tr. 875. He opined that Plaintiff could lift up to 50 pounds occasionally and 25 pounds frequently. Tr. 875.

The ALJ gave little weight to Dr. Maki's opinion because "[t]he diagnoses were based on the claimant's self-report, which is not consistent with the medical record." Tr. 2204. Plaintiff does not challenge the ALJ's assessment of Dr. Maki's opinion, but the Court includes it for context because Dr. Stein relied on it.

E.      Dr. Stein

Dr. Alvin Stein, MD, testified at Plaintiff's hearing in December 2020 as an independent medical expert. Tr. 58. Dr. Stein noted the recurrence of neuroendocrine tumors and noted that a gastrectomy had been recommended. Tr. 60. He stated that both the tumors and Plaintiff's gastric problems, which increased the risk of stomach cancer, supported the recommendation of a gastrectomy, but noted that Plaintiff declined surgery. Tr. 60. Dr. Stein recommended that Plaintiff have surgery "to prevent this from becoming a metastatic disease." Tr. 70. He testified that Plaintiff's tumors would not cause fatigue. Tr. 79.

Dr. Stein stated that "the thing that bothered me most about the case is that she has been largely seen by integrative holistic physicians that she's searched them out," noting that Plaintiff had been to 13 providers. Tr. 61. He stated, "the patient apparently has refused to take medicines. She's had a number of them prescribed for her for conditions she has, and she doesn't take them." Tr. 62. He noted that Plaintiff was often recorded as not taking any medications. Tr. 62. Dr. Stein recognized Plaintiff's iron deficiency anemia and stated, "she has a number of little problems that would respond to treatment, including some of her major complaints." Tr. 62. He

wrote that "there is nothing that she's being treated to help" her severe fatigue. Tr. 62. He noted

that Plaintiff had depression and anxiety, and stated that those conditions could cause fatigue. Tr.

62. He stated that he was surprised that Plaintiff was not on medication for her mental health

conditions or a medication such as Provigil or Ritalin. Tr. 63.

With respect to Plaintiff's sleep, Dr. Stein stated, "She doesn't apparently have too much

of a sleep disorder," noting that Plaintiff reported sleeping seven hours at night but was fatigued

during the day. Tr. 63. He wrote that this condition was "not being addressed at all except maybe

with the nutrition." Tr. 63. He noted that Plaintiff often took "about 30 different vitamins and

herbs . . . and no drugs at all." Tr. 63. He did not believe the vitamins and herbs would help

Plaintiff with her conditions. Tr. 63.

Dr. Stein stated that Plaintiff had not been taking iron for her anemia and recognized the

side effect of facial swelling as the reason Plaintiff refused to take intravenous iron. Tr. 63. He

also stated that he was not sure that Plaintiff could tolerate or absorb iron well given her stomach

problems. Tr. 63. He stated that her iron deficiency was "largely going untreated." Tr. 63. He

suggested that Plaintiff could try a different brand of intravenous iron that might not cause side

effects. Tr. 64. He surmised that this could reduce Plaintiff's fatigue. Tr. 64.

Dr. Stein concluded that Plaintiff did not have Lyme disease. Tr. 65. He noted that

Plaintiff later recognized that she did not have Lyme disease. Tr. 65. He stated that many of

Plaintiff's symptoms, including fatigue, were attributed to Lyme disease. Tr. 65. He stated that

Plaintiff did not have a disease similar to Lyme disease that could cause her symptoms. Tr. 65.

Dr. Stein noted Dr. Maki's examination of Plaintiff. Tr. 66. He stated that the

examination "was entirely normal." Tr. 66-67. He did recognize that the examination "could take

a half hour to 45 minutes" and that Dr. Maki "hasn't seen [Plaintiff] functioning away from this

examination[.]" Tr. 67. He contrasted this with all other examinations of Plaintiff that found her to be "very weak," and stated that "there is no clear evidence for a condition which should be making her that disabled." Tr. 67. He again noted that Plaintiff was not taking medications. Tr. 67-68.

As to the diagnosis of POTS, Dr. Stein testified that there were several medications Plaintiff could take. Tr. 68-69. He noted that compression stockings could also be used. Tr. 68-69. He concluded that Plaintiff had had no treatment for her condition. Tr. 69. He concluded, "Well, she takes no medicines, she's going to suffer the consequences and the consequences, aside from this tumor, is fatigue, inability to do any work, and certainly it's mentioned the depression and anxiety in there as well." Tr. 69-70. He opined that if Plaintiff took medications, "she would be feeling a lot better. She would have significantly less fatigue." Tr. 71.

Dr. Stein disagreed with Dr. Maki's assessment that Plaintiff could do medium work because "[i]f she's been inactive and hasn't been doing any kind of work, she certainly would not be able to do that kind of work." Tr. 72. He opined that Plaintiff could do light work. Tr. 74. He did not find the opinions of Plaintiff's treating naturopaths credible because he believed they simply wrote down what Plaintiff told them about her limitations. Tr. 73. He opined that Plaintiff faced some postural and environmental restrictions because of the gastric procedures she had undergone and her recent inactivity. Tr. 75-76.

The ALJ gave Dr. Stein's testimony significant weight. Tr. 2203. The ALJ stated:

> Dr. Stein is a highly qualified medical expert, and his opinion is supported by a complete review of the medical records, is consistent with the claimant's many years' pursuit of treatment for symptoms, and with her several years' course of medical treatment for neuroendocrine tumor. It is also consistent with the claimant's statements of relatively good day to day activity levels toward the beginning of her period of alleged disability, to more sedentary activities more recently. However, little weight is given to Dr. Stein's recommended limitations on crawling, upper extremity manipulative activities, and environmental limitations,

because the medical record does not reflect the kinds of limitations that affect ability to breathe, crawl, or use her hands or fingers.

Tr. 2203.

Plaintiff challenges the ALJ's finding that Dr. Stein's assessment is consistent with her treatment history. Dr. Stein concluded that Plaintiff was not adequately treating her conditions and asserted that she would feel better if she did so. Dr. Stein found it troubling that Plaintiff at times preferred naturopathic remedies over conventional Western medicine. The ALJ adopted this reasoning. The reasoning is partially erroneous. As discussed above, the record does not show that Plaintiff failed to treat her neuroendocrine tumors; it shows she was following the advice of multiple medical professionals, including her surgeons and a specialist in carcinomic tumors. The ALJ failed to consider Plaintiff's medically supported concerns about stomach surgery in giving significant weight to Dr. Stein's opinion.

Plaintiff argues that Dr. Stein relied on an absence of objective findings that would support the limitations Plaintiff's treating sources assessed. Pl. Op. Br. 9. Plaintiff points to a statement from Dr. Sankey that the hormonal imbalances from the neuroendocrine tumor could have been expected to manifest 9 years before it was discovered. *Id.* (citing Tr. 2654). In December 2020, shortly before the hearing at which Dr. Stein testified, Dr. Sankey recorded that the average time between symptom onset and diagnosis of neuroendocrine tumors is approximately 9 years, and it was 8 years in Plaintiff's case. Tr. 2654. Neither Dr. Stein nor the ALJ addressed this. To the extent Dr. Stein found that Plaintiff's stomach carcinoma was the only objective sign of disability, the failure to consider how long the tumor may have affected Plaintiff before it was diagnosed undermines the ALJ's decision to give significant weight to Dr. Stein's opinion.

The primary basis of Dr. Stein's opinion, which the ALJ relied on, was that Plaintiff did not pursue appropriate treatment for her conditions once she was aware of them. Plaintiff asserts that Dr. Stein misunderstood the record. Pl. Op. Br. 9. She argues that Dr. Stein erroneously concluded that Plaintiff was not treating her anemia, while the record showed that Plaintiff was taking iron supplements. *Id.* The record shows that Plaintiff started taking slow iron in November 2020, before Dr. Stein testified at Plaintiff's hearing in December 2020. Tr. 1938. The record also shows that Plaintiff sought treatment for her anemia throughout the relevant period, but some treatments either were ineffective or caused side effects. There was a period in which Plaintiff was not taking iron supplements, but the record shows it was because of side effects. Dr. Stein did not acknowledge that Plaintiff had side effects from oral iron, but he did express doubts about whether oral iron would be effective, and recommended that Plaintiff try a different brand of iron infusion. Plaintiff subsequently did so and reported that it was ineffective. The ALJ did not fully acknowledge the documented side effects from the anemia treatments. And because the ALJ relied on Dr. Stein's theory that Plaintiff would feel better if she took more medication, he should have considered Plaintiff's subsequent treatment in weighing Dr. Stein's opinion. After Dr. Stein rendered his opinion, Plaintiff tried another brand of iron infusion, and it was not very effective. Tr. 3370.

The ALJ was partially correct in finding Dr. Stein's assessment of Plaintiff's POTS consistent with the record. Dr. Stein stated that Plaintiff's POTS was untreated. In July 2021, Dr. Guggenheim described the POTS as "essentially untreated." Tr. 3643. Both Dr. Guggenheim and Dr. Stein believed that POTS could cause fatigue. Tr. 68-70, 3643. Dr. Stein suggested that Plaintiff take medication to manage her POTS. Dr. Guggenheim noted that Plaintiff was not taking propranolol because her blood pressure was too low. Tr. 3629. Plaintiff tried other

treatments, including compression socks, and they were not helpful. Tr. 3629. The ALJ did not

consider the viability of medication in weighing Dr. Stein's opinion.

Dr. Stein also stated that Plaintiff's depression and anxiety could cause fatigue and were

untreated. Tr. 62. Plaintiff testified in December 2020 that she had rejected an antidepressant in

2011 because she did not think it was necessary, and that she had just been prescribed Adderall.

Tr. 84. Plaintiff did later try Ritalin, one of the medications Dr. Stein recommended, and it

caused disruptive side effects and worsened her focus. Tr. 2656, 2668. In general, the ALJ erred

in assigning significant weight to Dr. Stein's opinion that Plaintiff would not be disabled if she

tried medications, because the record shows that Plaintiff had tried many of those medications or

later tried them and they were unhelpful. The ALJ failed to acknowledge the repeatedly

documented serious side effects from the medications Plaintiff tried or that some medications

were contraindicated.

The ALJ also agreed with Dr. Stein that Plaintiff was not using enough Western

medicine. The ALJ somewhat overstated the extent to which that was the case, but the record

does show that there were periods in which Plaintiff was only taking naturopathic supplements.

In many cases, that observation could be a valid basis to assign more significant weight to Dr.

Stein's opinion. However, the record shows that Plaintiff tried many conventional Western

treatments and later tried many of the treatments Dr. Stein advocated, and many of them either

did not work or caused serious side effects. The record also shows that some medications were

contraindicated. The ALJ failed to fully consider this evidence. It was error to assign such

significant weight to Dr. Stein's opinion based on consistency with the treatment records.

The ALJ also assigned significant weight to Dr. Stein's opinion because it was

"consistent with the claimant's statements of relatively good day to day activity levels toward the

beginning of her period of alleged disability, to more sedentary activities more recently." Tr. 2203. This was error. As the Court has explained, the ALJ erred in assessing Plaintiff's activity level. Indeed, Dr. Stein described Plaintiff as inactive and acknowledged that the record indicated that Plaintiff had a lot of fatigue. He asserted that she would feel better with a more robust treatment regimen. As the Court has explained, the record as a whole does not support giving such significant weight to that assertion.

The ALJ partially erred in asserting that Plaintiff had better activity levels during the earlier part of the relevant period. Plaintiff testified that she spent the period between 2011 and 2013 with her mother and had a brief failed work attempt in 2012 because her symptoms were so debilitating. Tr. 2234-2235. Medical records from 2011 reflect that Plaintiff felt unwell, with symptoms including fatigue, aches, and a rapid heart rate. Tr. 653-655, 669. Medical records from 2012 reflect that Plaintiff felt better after taking penicillin, but her fatigue returned after she was no longer taking it. Tr. 839, 841. She reported feeling better in September 2013 after acupuncture. Tr. 793-798. The record shows that Plaintiff had poor activity levels in the early years after her alleged onset date. This matters because Plaintiff's date last insured is December 31, 2013. For most of the period of her DIB claim, the record does not support the ALJ's finding that Plaintiff was more active.

As discussed above, the record does show that Plaintiff became somewhat more active beginning in late 2013. Plaintiff testified at her hearing in 2023 that she had seen a lot of physicians and they had not figured out what was wrong with her, so "I started seeing all these naturopathic doctors or ones that were more investigatory." Tr. 2248. She testified that she "had a big downward turn" in approximately 2017 or 2018, at which point she started seeing medical doctors again. Tr. 2248. The record may support a finding that Plaintiff was more active for

some period beginning in late 2013, but the ALJ did not adequately specify the timeframe. And even if the record does support such a finding, the ALJ failed to point to any evidence that Plaintiff could work for 40 hours per week during the relevant period based on her activity levels. In sum, the ALJ erred in assigning significant weight to Dr. Stein's opinion.

Plaintiff argues that the opinions of her treating naturopaths should have been given more weight than Dr. Stein's opinion because they had been treating her for several years and were familiar with her conditions. Pl. Reply 3 (citing 20 C.F.R. § 404.1527(c)(2)). Plaintiff argues that the naturopaths' opinions were supported by evidence Dr. Stein ignored. *Id.* at 3-4. To the extent that Plaintiff is relying on the absenteeism limitation only, the naturopaths' opinions are consistent with each other and the record. The Court concludes that under the unique circumstances of this case, the ALJ erred in assigning greater weight to Dr. Stein's opinion than the naturopaths' opinions for the reasons Plaintiff lists. While the Court would usually hesitate to find that an ALJ erred in assigning greater weight to a medical doctor's opinion than to a naturopathic doctor's opinion, this case is unusual. The treating naturopaths saw Plaintiff regularly and were able to observe her levels of fatigue over a period of time. Dr. Stein never examined Plaintiff, and his opinion was based solely on a review of the medical records. Dr. Stein acknowledged that the medical records showed that Plaintiff had a lot of fatigue. Tr. 67. He opined that Plaintiff would feel much better if she took certain medications. As discussed above, the record does not support that assertion. Plaintiff tried many treatments, and they did not resolve her symptoms enough to allow her to work full time. The record does not support a finding that Plaintiff would be able to maintain attendance at a full-time job.

//

//

### III.    Nature of Remand

Plaintiff argues that her case should be remanded for an award of benefits rather than further proceedings. Pl. Op. Br. 16. Defendant argues that any remand should be for further proceedings. Def. Br. 12. The Court concludes that a remand for benefits is appropriate here.

To determine whether it is appropriate to remand for payment of benefits or for further proceedings, the Ninth Circuit uses a three-part test. *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014); *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1100 (9th Cir. 2014). First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion. *Garrison*, 759 F.3d at 1020. Second, the record must be fully developed, and further administrative proceedings would serve no useful purpose. *Id.* Third, if the Court remands the case and credits the improperly discredited evidence as true, the ALJ would be required to find the claimant disabled. *Id.* To remand for an award of benefits, each part of the test must be satisfied. *Id.* The "ordinary remand rule" is "the proper course," except in rare circumstances. *Treichler*, 775 F.3d at 1099-100. In deciding whether to remand for further proceedings or payment of benefits, the district court should consider whether the claimant's testimony was inconsistent with the medical evidence, or whether the government has pointed to evidence that the ALJ overlooked. *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015).

The ALJ erred in assessing Plaintiff's testimony about her fatigue and in weighing several medical opinions. If the Court were to credit the testimony of Plaintiff that she cannot work more than 20 hours per week because of her fatigue and the opinions of her treating naturopaths that Plaintiff would miss more than 16 hours of work per month, the ALJ would be required to find Plaintiff disabled. The vocational expert testified that someone who would miss

more than 16 hours of work per month on an ongoing basis could not work full time. Tr. 2254-2255.

Defendant argues that any remand should be for further proceedings because "Plaintiff's treatment history, clinical findings, and activities, as well as the prior administrative medical findings of the State agency consultants, consultative examiner, and the opinion of medical expert Dr. Stein all indicate that Plaintiff can work." Def. Br. 12. Plaintiff's treatment history and activities do not indicate that she can work 40 hours a week on a sustained basis. The ALJ did not give significant weight to the opinion of the consultative examiner, and gave some weight to the opinions of the agency consultants based on his erroneous interpretation of Plaintiff's activities. And Dr. Stein acknowledged that the record showed that Plaintiff had a lot of fatigue, but asserted that she would feel better if she took certain medications. As the Court has discussed at length, the record shows that Plaintiff tried many of those treatments and they were ineffective. The ALJ failed to acknowledge that evidence.

Plaintiff notes that her claim was filed almost ten years ago and that it now involves a closed period of time, so there is no new evidence for the relevant time period. Pl. Reply 8. There have been four administrative hearings in this case, most recently after a stipulated remand from another judge in this district. The Court agrees with Plaintiff that "[t]he Commissioner should not be afforded yet another opportunity to consider the same evidence." *Id.* (citing *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication."); *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir. 2004) ("The Commissioner, having lost this appeal, should not have another opportunity to show that Moisa is not credible

any more than Moisa, had he lost, should have an opportunity for remand and further

proceedings to establish his credibility.")). The Court remands this case for an award of benefits.

## CONCLUSION

Based on the foregoing, the Commissioner's decision is REVERSED and REMANDED

for immediate payment of benefits.

IT IS SO ORDERED.

DATED:_____May 2, 2024_____.


MARCO A. HERNÁNDEZ
United States District Judge